UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

LG CAPITAL FUNDING, LLC,

                                        Plaintiff,

                                                            **REPORT AND**
            -against-                                       **RECOMMENDATION**
                                                            17-CV-1297-NGG-SJB
POSITIVEID CORPORATION,

                                        Defendant.
-------------------------------------------------------------------X

**BULSARA, United States Magistrate Judge:**

Plaintiff LG Capital Funding, LLC ("LG") commenced this action against

PositiveID Corporation ("PSID") on March 7, 2017. (Compl. dated Mar. 7, 2017, Dkt.

No. 1). The lawsuit alleges multiple breaches of contract of a convertible promissory

note (the "Note") issued to LG by PSID. The Note gave LG the option to convert the

loan into shares of PSID and required that PSID keep a certain number of its shares in

reserve for such a conversion. According to LG, PSID failed to maintain the adequate

number of shares in its reserve, deliver shares upon LG's request, and otherwise comply

with its obligations under the Note. (*Id.*). PSID does not dispute the various alleged

breaches, but asserts that the Note is an unenforceable contract, because its interest

provisions amount to criminal usury and its terms are unconscionable. (*See* Mem. of

Law in Opp'n filed Sept. 6, 2018, attached as Ex. 1 to Decl. of Jonathan Uretsky

("Uretsky Decl."), Dkt. No. 33 ("Def.'s Resp.")). In addition to breach of contract, LG's

Complaint also contains a number of other related contract and tort claims, all based on

the same conduct by PSID.[1]

---

[1] This action appears to be part of "a string of [similar if not identical] actions
brought in [the Southern District of New York] and in the Eastern District of New York
over the last twelve months, all involving (1) alleged breaches of nearly identical

LG originally sought a preliminary injunction requiring PSID to deliver 65,536,000 shares of its stock to LG, maintain adequate share reserves as outlined in the Note, and honor all future conversion requests by LG, (Compl. ¶¶ 37, 46, 53, 61; *see also* Req. for Order to Show Cause dated Mar. 7, 2019, Dkt. No. 2 ("Prelim. Inj. Req.")); however, after a hearing, the Court denied LG's motion for preliminary injunction for failure to show irreparable harm, (Mem. & Order dated June 12, 2017, Dkt. No. 21, at 9).

The parties proceeded to discovery, and on September 6, 2018, LG filed a motion for summary judgment on its breach of contract and attorney's fees claims. (*See* Pl.'s Mem. of Law in Supp., attached at Ex. 12 to Mot. for Summ. J. filed Sept. 6, 2018 ("Pl.'s Mot."), Dkt. No. 31 ("Pl.'s Mem.") at 1).[2] The same day, PSID filed a motion for summary judgment. (*See* Mot. for Partial Summ. J. filed Sept. 6, 2018, Dkt. No. 35 ("Def.'s Mot.")). On September 10, 2018, the Honorable Nicholas G. Garaufis referred the motions to the undersigned for a report and recommendation. (Order Referring Mots. dated Sept. 10, 2018). For the reasons described below, the Court respectfully recommends that LG's motion be granted as to liability on its breach of contract and attorney's fees claims, with damages from that breach and the amount of fees to be

---

convertible promissory notes and (2) affirmative defenses based principally on New York's criminal usury statute" by LG on identical promissory notes issued to penny stock companies. *EMA Fin., LLC v. AIM Expl., Inc.*, No. 18-CV-145, 2019 WL 689237, at *1 n.1 (S.D.N.Y. Feb. 19, 2019) (collecting cases).

[2] LG's breach of contract claims are as follows: failure to deliver shares, seeking an injunction (Claim 1); failure to deliver shares, seeking damages (Claim 2); and failure to reserve shares, seeking an injunction (Claim 3). (*See* Compl. ¶¶ 31-46). LG's anticipatory breach of contract claims are Claim 4, which seeks an injunction, and Claim 5, which seeks damages. (*See id.* ¶¶ 47-55). LG's conversion claims are Claim 6 and Claim 7. (*See id.* ¶¶ 56-63). LG's attorney's fees and costs claim is Claim 8. (*See id.* ¶¶ 64-66). LG did not move for summary judgment on its anticipatory breach of contract claims or its conversion claims.

determined after further submission by LG, and that PSID's motion be granted only as to LG's conversion claims and otherwise be denied.

<u>LEGAL STANDARDS</u>

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see generally Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co*., 875 F.3d 107, 113 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)). "In determining whether summary judgment is appropriate, [the Court] must resolve all ambiguities and draw all reasonable inferences against the moving party." *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986)).

The movant bears the burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" in one of two ways. Fed. R. Civ. P. 56(c)(1). It may cite to portions of the record "including depositions, documents, electronically stored information, affidavits or declarations," "admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Alternatively, it may show that "the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B); *see generally Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988). "[T]he fact that both parties have moved for summary judgment does not mean that the Court must grant summary judgment for one of the parties, and it does not change the

burden on the moving party to show the absence of a genuine issue of fact. Each party's motion must be evaluated on its own merits and all reasonable inferences must be drawn against the party whose motion is under consideration." *Wagner v. Cty. of Cattaraugus*, 866 F. Supp. 709, 714 (W.D.N.Y. 1994) (citations omitted) (citing *Eastman Mach. Co. v. United States,* 841 F.2d 469, 473 (2d Cir. 1988) and *Schwabenbauer v. Bd. of Educ. of Olean,* 667 F.2d 305, 314 (2d Cir. 1981)).

In moving for summary judgment or answering such a motion pursuant to Federal Rule of Civil Procedure 56, litigants in this District are required by the Local Rules to provide a statement setting forth purported undisputed facts or, if controverting any fact, responding to each assertion. In both instances, the party must support its position by citing to admissible evidence from the record. Local Rule 56.1(b), (d); *see also* Fed. R. Civ. P. 56(c) (requiring reliance on admissible evidence in the record in supporting or controverting a purported material fact). "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001).

Where genuinely disputed, "the Court will consider the sources for the claims made in dueling Rule 56.1 Statements . . . , rather than rely on the Rule 56.1 Statements themselves[.]" *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 396 (S.D.N.Y. 2015). In evaluating the sources of claims made in dueling Rule 56.1 statements, the Court cannot—as is true for the summary judgment motion as a whole—weigh evidence or assess the credibility of witnesses. *See United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994). Legal arguments are impermissible in any Rule 56.1 Statement and are to be disregarded. *See Congregation Rabbinical Coll.*

*of Tartikov*, 138 F. Supp. 3d at 394 ("[T]he Court can . . . disregard legal conclusions or unsubstantiated opinions in a Local Rule 56.1 statement."); *Lawrence v. Cont'l Cas. Co.*, No. 12-CV-412, 2013 WL 4458755, at *1 n.1 (E.D.N.Y. Aug. 16, 2013) ("Both parties have submitted Local Rule 56.1 statements and responses to each other's statements that mix factual assertions with legal argument and therefore fail to meet the requirements of Local Rule 56.1. The facts . . . are taken from those assertions . . . that comply with Local Rule 56.1[.]") (citations and quotations omitted). In addition, where the opposing party fails to specifically controvert a numbered paragraph in the Rule 56.1 statement, the statement by the moving party "will be deemed to be admitted." Local Rule 56.1(c).

Here, PSID consistently engages in improper summary judgment practice by making arguments and legal conclusions in its Rule 56.1 Statements. For example, PSID frequently makes the legal defense of usury and states that various provisions in the Note are illegal. (*See, e.g.*, Def.'s Counter-Statement of Facts filed Sept. 6, 2018, Dkt. No. 34 ("Def.'s Resp. Rule 56.1 Stmt.") ¶¶ 88, 92 ("The lookback and discount in the Note are toxic conversion rights.")). The Court disregards such statements, particularly those in PSID's Additional Material Facts. (*See id.* ¶¶ 86-129); *see, e.g.*, *EMA Fin., LLC v. AIM Expl., Inc.*, No. 18-CV-145, 2019 WL 689237, at *1 n.3 (S.D.N.Y. Feb. 19, 2019); *Union Capital LLC v. Vape Holdings Inc.,* No. 16-CV-1343, 2017 WL 1406278, at *1 n.1 (S.D.N.Y. Mar. 31, 2017). Likewise, except to the extent noted, PSID's Rule 56.1 Statement of Facts in support of its own motion for summary judgment suffers from the same defects. (*See* Def.'s Rule 56.1 Statement filed Sept. 6, 2018, Dkt. No. 36 ("Def.'s Rule 56.1 Stmt.")).

In addition, PSID did not respond to LG's counter-statement of facts submitted in response to PSID's motion. However, LG itself notes that this counter-statement of

facts is largely a repetition of its previous Rule 56.1 statement to which PSID did respond, and that only paragraphs 1 through 12 assert new alleged facts. (Pl.'s Resp. to Def.'s Rule 56.1 Stmt. filed Sept. 6, 2018, Dkt. No. 38 ("Pl.'s Resp. Rule 56.1 Stmt.") at 8 n.1 ("With the exception of Statements 1 through 12, Plaintiff's Counter-Statements of Undisputed Facts are identical to Plaintiff's 56.1 Statement filed with Plaintiff's Motion for Summary Judgment.")).[3] Thus, only paragraphs 1 through 12 of LG's counter-statement are deemed admitted for failure to respond.

PSID's biggest shortcoming, however, is its failure to provide the Court with precise pinpoint citations to evidence in its Rule 56.1 statements and objections. For example, PSID frequently cites to three or more pages of a deposition, (*see, e.g.*, Def.'s Resp. Rule 56.1 Stmt. ¶¶ 112, 116, 128), and at one point cites to *13 pages* of deposition testimony for the proposition that "LG does not know anything about any of the lawsuits, Notes, companies, or predicate facts behind any of the lawsuits it has ever filed against any company in any jurisdiction," (*id.* ¶ 113 (citing Dep. of Eli Safdieh filed Sept. 6, 2018, attached as Ex. 1 to Uretsky Decl., Dkt. No. 35 ("Safdieh Dep. I"))).[4] Because this approach undermines the purpose of Local Rule 56.1 and forces the Court to unnecessarily sift through evidence, the Court directed parties to supplement their

---

[3] LG's response to PSID's 56.1 Statement contains two sections: "Plaintiff's Specific Responses" and "Plaintiff's Counter-Statements." The counter-statement of facts resets the paragraph numbering value at 1, and both sections contain paragraphs labeled 1 through 42. Unless otherwise noted, the Court's citations refer to the first section of this filing, "Plaintiff's Specific Responses."

[4] Adding to the lack of utility of PSID's materials, the transcript of Safdieh's deposition testimony did not originally contain page numbers. (It was only after the Court directed parties to supplement the deposition transcripts with assigned page numbers that *LG* provided the Court with usable deposition testimony of Eli Safdieh. (*See* Dep. of Eli Safdieh filed June 18, 2019, attached as Ex. B to Decl. of Kevin Kehrli ("Kehrli Decl."), Dkt. No. 45 ("Safdieh Dep. II")).

filings with line number citations and warned that "[f]ailure to do so will result in the Court disregarding any statement citing to such materials." (Order dated June 12, 2019). LG supplemented its Rule 56.1 Statements, (*see* Decl. of Kevin Kehrli dated June 18, 2019, Dkt. No. 45 ("Kehrli Decl.")); PSID did not. The Court, therefore, disregards any statements or objections supported by broad citations, without pincites, to deposition testimony.

FACTS

Unless otherwise noted, based on the review of the depositions, declarations, exhibits, pleadings, and other evidence, the Court has determined the following facts are beyond genuine dispute and supported by admissible evidence. As described above, the Court does not consider Rule 56.1 statements that are legal conclusions, irrelevant, or merely object to inferences drawn from the opposing party's statements. Statements to which the opposing party did not respond are deemed admitted, and any statements or objections that do not provide specific line number citations to depositions are disregarded.

I.    The Parties and the Note

LG is a New York limited liability company located at 1218 Union Street, Suite 2, Brooklyn, NY 11225. (Pl.'s Rule 56.1 Statement filed Sept. 6, 2018, Dkt. No. 32 ("Pl.'s Rule 56.1 Stmt.") ¶ 1; Def.'s Resp. Rule 56.1 Stmt. ¶ 1). PSID is a Delaware corporation with its principal place of business at 1690 South Congress Avenue, Suite 201, Delray Beach, FL 33445. (Pl.'s Rule 56.1 Stmt. ¶ 2; Def.'s Resp. Rule 56.1 Stmt. ¶ 2). PSID is publicly traded on the Over-The-Counter Market under the symbol "PSID." (Pl.'s Rule

56.1 Stmt. ¶ 3; Def.'s Resp. Rule 56.1 Stmt. ¶ 3).  Because PSID is a micro-cap company,[5] its financing is generally limited to convertible debt instruments, which give the holder of the instrument "the ability to convert principal and interest into common stock in the future . . . at future pricing."  (Pl.'s Rule 56.1 Stmt. ¶¶ 7-8 (quotations omitted); Def.'s Resp. Rule 56.1 Stmt. ¶¶ 7-8).

Beginning in 2015, PSID was in need of cash and issued three convertible notes— essentially promises to pay LG back for loans—to LG.  (Pl.'s Rule 56.1 Stmt. ¶¶ 9-12; Def.'s Resp. Rule 56.1 Stmt. ¶¶ 9-12).  There were never any disputes over these three notes; PSID paid back two and LG converted the principal and interest on the third into shares in lieu of cash repayment.  (Pl.'s Rule 56.1 Stmt. ¶¶ 12-13; Def.'s Resp. Rule 56.1 Stmt. ¶¶ 12-13).

On July 7, 2016, PSID issued LG a fourth convertible note ("the Note") with a face value of $66,150, a 10% interest rate, and a maturity date of July 7, 2017.  (Pl.'s Rule 56.1 Stmt. ¶¶ 14-16, 20; Def.'s Resp. Rule 56.1 Stmt. ¶¶ 14-16, 20; *see* Note, attached as Ex. A to Decl. of Joseph Lerman ("Lerman Decl."), attached as Ex. 3 to Pl.'s Mot., Dkt. No. 31 ("Note")).  The Note included a 5% Original Issue Discount ("OID"), (Pl.'s Rule 56.1 Stmt. ¶ 17; Def.'s Resp. Rule 56.1 Stmt. ¶ 17), which is the "difference between a [note's] face value and the price at which it is initially sold."  *Original-Issue Discount*, Black's Law Dictionary (10th ed. 2014).  In other words, a Note with a face value of $66,150 and a 5% OID has a purchase price for LG of $63,000,[6] a discount of $3,150

---

[5] According to LG, a micro-cap company is also known as a "penny stock" company.  (Pl.'s Mem. at 7).

[6] (66,150-63,000) ÷ 63,000 = .05 or 5%.

from the face amount.  Parties refer in their papers to this $3,150 "origination fee," (*see* Def.'s Resp. at 6; Pl.'s Reply Mem. in Supp. of Pl.'s Mot. filed Sept. 7, 2018, Dkt. No. 41 at 3-4 ("Pl.'s Reply")), which is "[a] fee charged by a lender for preparing and processing a loan," Black's Law Dictionary 732 (10th ed. 2014).  A borrower—in this case PSID— owes the lender the Note's face amount ($66,150).

The Note's face amount of $66,150 is not disputed, nor is the existence of a 5% OID.  (Pl.'s Rule 56.1 Stmt. ¶¶ 15, 17; Def.'s Resp. Rule 56.1 Stmt. ¶¶ 15, 17).  LG contends the purchase price of the Note is $63,000, while PSID believes it to be $60,000 because that is the amount it received directly from LG.  (Pl.'s Rule 56.1 Stmt. ¶ 18; Def.'s Resp. Rule 56.1 Stmt. ¶ 18).[7]  Pursuant to instructions from PSID, LG wired $60,000 to PSID and $3,000 to New Venture Attorneys, "'the attorneys who drafted the documents for th[e] transaction,'" as disbursement of the loan on July 7, 2016.  (Pl.'s Rule 56.1 Stmt. ¶¶ 23-25 (quoting Dep. of William Caragol filed Sept. 6, 2018, attached as Ex. A to Kehrli Decl., Dkt. No. 31 ("Caragol Dep.") at 45:13-14); Def.'s Resp. Rule 56.1 Stmt. ¶¶ 23-25; *see* Disbursement Authorization filed Sept. 6, 2018, attached as Ex. B to Lerman Decl., Dkt. No. 31 ("Disbursement Mem.")).[8]  This procedure, whereby the borrower pays the attorney's fees and the lender sends those fees directly to the attorneys, is common among notes involving PSID.  (Pl.'s Rule 56.1 Stmt. ¶ 26; Def.'s Resp. Rule 56.1 Stmt. ¶ 26).

---

[7] It is inconsistent for PSID to agree the Note contains a 5% OID but disagree that the purchase price is $63,000.  If the purchase price was $60,000, as PSID contends, the OID would actually have been over 10%.  (($66,150-60,000) ÷ 60,000= .1025 or 10.25%).

[8] New Venture Attorneys represented LG.  (Def.'s Resp. Rule 56.1 Stmt. ¶ 86; Pl.'s Resp. to Def.'s Counter-Statement filed Sept. 7, 2018, Dkt. No. 42 ("Pl.'s Reply Rule 56.1 Stmt.") ¶ 86).

The Note contains several relevant provisions. First, the Note provides LG with a right of conversion in which "LG is entitled to convert all or any amount of the outstanding balance and accrued interest of the Note into shares of PSID's Common Stock" upon submission of a notice of conversion. (Pl.'s Rule 56.1 Stmt. ¶¶ 28-29; Def.'s Resp. Rule 56.1 Stmt. ¶¶ 28-29). The price of conversion is 65% of the lowest closing bid price of PSID common stock for the fifteen prior trading days, which gives LG a 35% conversion discount off the trading price of PSID's securities. (Pl.'s Rule 56.1 Stmt. ¶¶ 32-34; Def.'s Resp. Rule 56.1 Stmt. ¶¶ 32-34). The Note required PSID initially to reserve 2,467,000 shares of common stock for conversion and maintain in reserve at least four times the number of shares required for the Note to be converted in full. (Pl.'s Rule 56.1 Stmt. ¶¶ 36-37; Def.'s Resp. Rule 56.1 Stmt. ¶¶ 36-37). LG was permitted to reasonably request increases in these shared reserves. (Pl.'s Rule 56.1 Stmt. ¶ 39; Def.'s Resp. Rule 56.1 Stmt. ¶ 39). Any unconverted principal and interest are due as of the Note's maturity date. (Pl.'s Rule 56.1 Stmt. ¶ 30; Def.'s Resp. Rule 56.1 Stmt. ¶ 30).

Second, the Note contains a prepayment provision that provides for penalties depending on the date of prepayment. (Def.'s Rule 56.1 Stmt. ¶ 34; Pl.'s Rule 56.1 Statement filed Sept. 6, 2018, Dkt. No. 38 ("Pl.'s Resp. Rule 56.1 Stmt.") ¶ 34; *see also* Note ¶ 4(c)). If PSID were to prepay the Note (*i.e.*, pay off the Note before payment was due) within 90 days of issuance, it would be required to pay 120% of its face value plus accrued interest; if PSID were to prepay the Note within 91 to 180 days of issuance, it would be required to pay 135% plus accrued interest. (Pl.'s Resp. Rule 56.1 Stmt. ¶ 2).[9] After 180 days, the Note could not be prepaid. (Note ¶ 4(c)).

---

[9] This citation refers to ¶ 2 in "Plaintiff's Counter-Statement" filed in response to PSID's motion.

Third, the Note defines various situations as Events of Default in which the interest rate increases to 24% and the Note becomes due immediately. (Pl.'s Rule 56.1 Stmt. ¶ 50; Def.'s Resp. Rule 56.1 Stmt. ¶ 50). Most relevant to the pending motions, PSID is in default if it fails to: (1) uphold any obligations under the Note; (2) increase the reserve of common stock within 3 days of LG's request; or (3) convert outstanding balance into common stock within 3 days of receipt of LG's notice of conversion. (Pl.'s Rule 56.1 Stmt. ¶¶ 47-49; Def.'s Resp. Rule 56.1 Stmt. ¶¶ 47-49). If upon default, a 24% interest rate is found to be usurious, the interest rate increases only to the highest extent permitted by law. (Pl.'s Rule 56.1 Stmt. ¶ 50; Def.'s Resp. Rule 56.1 Stmt. ¶ 50).

Fourth, the Note provides that PSID is responsible for costs, expenses, and attorney's fees incurred for collecting any amount due under the Note, including in the event LG has to file suit to enforce the Note's provisions. (Pl.'s Rule 56.1 Stmt. ¶¶ 83-84; Def.'s Resp. Rule 56.1 Stmt. ¶¶ 83-84). Should a court find any provision in the Note to be invalid, the Note provides that such provision be adjusted rather than voided. (Pl.'s Rule 56.1 Stmt. ¶ 85; Def.'s Resp. Rule 56.1 Stmt. ¶ 85; *see* Note ¶ 9).

## II.    The Alleged Breaches of Contract

LG alleges three primary breaches of contract or events of default. First, on January 9, 2017, LG requested, by email to PSID's transfer agent VStock Transfer LLC ("VStock"), an increase in the number of its shares held in reserve. (Pl.'s Rule 56.1 Stmt. ¶ 51; Def.'s Resp. Rule 56.1 Stmt. ¶ 51). VStock was unable to process this request; it did not have the documentation necessary to do so and PSID did not have enough available shares in its treasury, a problem PSID was apparently aware of two months prior to the request. (Pl.'s Rule 56.1 Stmt. ¶¶ 52-57; Def.'s Resp. Rule 56.1 Stmt. ¶¶ 52-57). The

increase request was not consummated within three days, as required under the Note. (Pl.'s Rule 56.1 Stmt. ¶ 74; Def.'s Resp. Rule 56.1 Stmt. ¶ 74).

Second, on January 24, 2017, LG submitted a notice of conversion to PSID electing to convert $16,150 of principal and $889.36 of accrued interest into 65,536,000 shares of PSID common stock at a price of $0.00026 per share. (Pl.'s Rule 56.1 Stmt. ¶¶ 59-60, 62; Def.'s Resp. Rule 56.1 Stmt. ¶¶ 59-60, 62). PSID never effectuated the conversion; the shares were never delivered. (Pl.'s Rule 56.1 Stmt. ¶¶ 63-64, 77; Def.'s Resp. Rule 56.1 Stmt. ¶¶ 63-64, 77). Had PSID made the conversion, LG alleges that it would have "made a return of $65,536.00 from third parties on its $17,039.36 conversion, or approximate[ly] 3.84 times the amount converted." (Def.'s Resp. Rule 56.1 Stmt. ¶ 129; Pl.'s Reply Rule 56.1 Stmt. ¶ 129). LG alleges, and PSID does not dispute, that "there were multiple different actions that PSID could have taken to attempt to honor LG's request to increase the share reserve and to honor the Notice of Conversion." (Pl.'s Rule 56.1 Stmt. ¶ 65; Def.'s Resp. Rule 56.1 Stmt. ¶ 65). These included: seeking approval to authorize increasing PSID's shares, asking other noteholders to release shares to LG, executing a reverse stock split before LG's reserves were depleted, or drawing shares from another reserve to honor its obligation to LG. (Pl.'s Rule 56.1 Stmt. ¶¶ 66, 68, 70, 72; Def.'s Resp. Rule 56.1 Stmt. ¶¶ 66, 68, 70, 72). PSID took none of these actions. (Pl.'s Rule 56.1 Stmt. ¶¶ 67, 69, 71, 73; Def.'s Resp. Rule 56.1 Stmt. ¶¶ 67, 69, 71, 73).

Third, although the Note matured on July 7, 2017, PSID has not paid back any of the amounts due. (Pl.'s Rule 56.1 Stmt. ¶¶ 78-79; Def.'s Resp. Rule 56.1 Stmt. ¶¶ 78-79).[10]

DISCUSSION

I.     LG's Motion for Summary Judgment

       A.     Liability for Breach of Contract

"A promissory note is a contract and is thus construed according to general rules of contract interpretation." *LG Capital Funding, LLC v. Ubiquity, Inc.*, No. 16-CV-3102, 2017 WL 3173016, at *2 (E.D.N.Y. May 12, 2017), *report and recommendation adopted*, 2017 WL 3168961 (July 25, 2017). The Note provides that New York law governs the agreement. (Note ¶ 14). To establish a breach of contract under New York law, a party must show: "(1) the existence of a contract, (2) performance by the party seeking recovery, (3) non-performance by the other party, and (4) damages attributable to the breach." *Prince of Peace Enters., Inc. v. Top Quality Food Mkt., LLC*, 760 F. Supp.2d 384, 397 (S.D.N.Y. 2011) (quotations omitted); *accord Adar Bays, LLC v. 5Barz Int'l, Inc.* ("*Adar Bays I*"), No. 16-CV-6231, 2018 WL 3962831, at *7 (S.D.N.Y. Aug. 16, 2018). "Summary judgment on a breach of contract claim 'is appropriate if the terms of the contract are unambiguous.'" *Adar Bays, LLC v. GeneSYS ID, Inc.* ("*Adar Bays II*"), 341 F. Supp. 3d 339, 347 (S.D.N.Y. 2018) (quoting *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011)). "[T]o grant summary judgment on a breach of contract claim, the Court must determine both (1) that there are no genuine issues of

---

[10] The Complaint does not allege PSID's failure to repay the Note upon maturity. This is likely because the Complaint was filed on March 7, 2017 and the Note reached maturity on July 7, 2017.

material fact that a party engaged or failed to engage in certain conduct, and (2) that such acts or omissions unambiguously breach the terms of the contract." *Kobrand Corp. v. Abadia Retuerta S.A.*, No. 12-CV-154, 2012 WL 5851139, at *5 (S.D.N.Y. Nov. 19, 2012).

PSID's briefs attempt to establish affirmative defenses of usury and, to a lesser extent, unconscionability; there is virtually no dispute that LG has established a breach of contract.

First, LG and PSID entered into a contract on July 7, 2016 through the issuance of the Note, which required PSID to maintain a certain number of reserve shares and convert the balance of the Note, or portions thereof, to its common stock at LG's request. (Pl.'s Rule 56.1 Stmt. ¶¶ 14, 28, 37-38; Def.'s Resp. Rule 56.1 Stmt. ¶¶ 14, 28, 37-38).

Second, LG performed its obligations under the Note by wiring $60,000 to PSID and $3,000 to New Venture Attorneys, a structure that was common for PSID's notes. (Pl.'s Rule 56.1 Stmt. ¶¶ 24-27; Def.'s Resp. Rule 56.1 Stmt. ¶¶ 24-27). While PSID disputes the characterization of the $3,000 transfer to New Venture Attorneys and its effect on the Note's interest rate, which is discussed below, it does not dispute that the transfer occurred or that LG performed its obligations under the Note. (Pl.'s Rule 56.1 Stmt. ¶ 25; Def.'s Resp. Rule 56.1 Stmt. ¶ 25).

Third, PSID failed to perform its obligations under the Note by failing to: (1) maintain the required number of shares of reserve stock and increase the reserve shares upon LG's request, (Pl.'s Rule 56.1 Stmt. ¶¶ 51-54, 75; Def.'s Resp. Rule 56.1 Stmt. ¶¶ 51-54, 75); (2) convert $16,150 in principal and $889.36 in accrued interest into 65,536,000 shares of common stock, as requested by LG on January 24, 2017, (Pl.'s

Rule 56.1 Stmt. ¶¶ 59-64; Def.'s Resp. Rule 56.1 Stmt. ¶¶ 59-64); and (3) repay the remaining principal and accrued interest, (Pl.'s Rule 56.1 Stmt. ¶¶ 78-79; Def.'s Resp. Rule 56.1 Stmt. ¶¶ 78-79). PSID admits that it failed to deliver shares, (*see* Def.'s Mem. of Law in Supp. filed Sept. 6, 2018, attached as Ex. 5 to Def.'s Mot., Dkt. No. 35 ("Def.'s Mem.") at 4), and that it failed to take specific actions, such as drawing from its preferred shares reserve, to honor LG's requests and avoid breach, (Pl.'s Rule 56.1 Stmt. ¶¶ 65-73; Def.'s Resp. Rule 56.1 Stmt. ¶¶ 65-73). Nor does it dispute that the Note has not been repaid. (Pl.'s Rule 56.1 Stmt. ¶ 79; Def.'s Resp. Rule 56.1 Stmt. ¶ 79).

Fourth, LG suffered damages as a result of PSID's failure to reserve shares, failure to deliver shares, and failure to repay the balance of the Note. While PSID argues the Note is void due to usury and, in the alternative, disputes LG's calculation of damages, it does admit LG suffered at least $15,729 in loss for failure to deliver shares.[11] (Decl. of William Caragol, attached as Ex. 3 to Def.'s Mot., Dkt. No. 35 ("Caragol Decl.") ¶¶ 10-13). In any event, it is undisputed that each of PSID's breaches caused at least some damage to LG.

This is sufficient for LG to achieve summary judgment on its breach of contract claims—subject to the affirmative defenses which are discussed below.[12]

---

[11] The failure to deliver shares was, at least in part, due to the failure to maintain adequate reserves. (Pl.'s Rule 56.1 Stmt. ¶¶ 54, 65-75; Def.'s Resp. Rule 56.1 Stmt. ¶¶ 54, 65-75).

[12] PSID does make the conclusory argument, which it does not explain, that "the Complaint does not actually allege breach of contract." (Def.'s Resp. at 1). The most the Court can infer is that PSID believes LG's claim for damages for failure to deliver shares, Claim 2, essentially does not list enough information under its heading to allege breach of contract. (*See* Def.'s Mem. at 3-4). It is also possible PSID is arguing that Claim 2 does not allege breach of contract because it is not labeled as such. (*See id.* at 4 n.2 ("Notably, the term 'Breach of Contract' is found in both the fourth and fifth Claims for Relief, but not the others, leading one to conclude that counsel knew how to designate a

B.     Usury Defense

PSID's primary argument is that, due to numerous provisions in the Note, the

Note is criminally usurious and thus void as a matter of law.[13]

If there are issues of material fact as to one or more elements of a non-moving

party's affirmative defense, then the moving party's summary judgment motion must be

denied. *See, e.g.*, *BTEC Turbines, LP v. Conn. Light & Power Co.*, No. 03-CV-1207,

2007 WL 3046257, at *7 (D. Conn. Oct. 17, 2007) ("[B]ecause CL & P has challenged the

validity of the Contract as a whole, the Court cannot determine whether CL & P is bound

---

Claim for Relief as a 'breach of Contract' claim if that is what it was intended as.")).
Neither argument has merit.

 Claim 2 incorporates the factual descriptions contained earlier in the Complaint,
and those factual descriptions allege LG requested conversion of 65,536,000 shares of
stock on January 24, 2017 and that PSID never delivered such shares.  (Compl. ¶¶ 10-14,
32-33, 38).  It also can be clearly inferred from the entire Complaint that LG alleges a
breach of contract.  *See Koury v. Xcellence, Inc.*, 649 F. Supp. 2d 127, 133 (S.D.N.Y.
2009) ("[F]actual allegations alone are what matter.  The Court . . . is required to read
the factual allegations in a complaint as a whole.") (quotations, citations, and alterations
omitted); 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1286
(3d ed. 2019) ("In construing a pleading, the court must look to the substance of the
entire pleading.  It will not do to take the words used in one part of the complaint and,
by separating them from the context and considering them without reference to the
complaint as a whole, to draw from them an inference favorable to the defendant's
theory, which is opposed to the one deduced from a reading of the whole complaint, and
the one that the pleader evidently had in mind in framing it.").

 PSID also makes other versions of this labeling argument with respect to other
counts in the Complaint.  They are equally without merit.

[13] PSID distinguishes unfavorable caselaw on the usury issue by blaming the
attorneys in those cases.  For example, PSID states that LG only prevailed in *LG Capital
Funding, LLC v. 5Barz International, Inc.* because of defendant's "misunderstanding of
what a Local Civil Rule 56.1 statement entails."  (Def.'s Reply Mem. of Law in Supp. of
Def.'s Mot. filed Sept. 7, 2018, Dkt. No. 43 ("Def.'s Reply") at 3 (citing 307 F. Supp. 3d
84, 88 (E.D.N.Y. 2018))).  Similarly, PSID states that the plaintiff in *Adar Bays, LLC v.
Aim Exploration, Inc.* prevailed because of defendant's "overly optimistic view of what
court[s] require from a defendant on a 12(c) motion" and then makes the bold assertion
that "[w]ere the standard switched, it appears the Court would have denied that
motion."  (*Id.* at 4 (citing 285 F. Supp. 3d 698, 700 (S.D.N.Y. 2018))).  These assertions
are baseless and do nothing to change the substantive analysis in those cases.

by the limited liability provision until the trier of fact resolves the genuine issues of material fact underlying CL & P's affirmative defenses.").  An affirmative defense does not preclude summary judgment if the non-moving party has failed to come forward with evidence on an element of that defense.  *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54-55 (2d Cir. 1994) ("[I]n cases where there is an absence of evidence to support an essential element of a defense, with respect to that defense, there can be no genuine issue as to any material fact since a complete failure of proof concerning an essential element of the defendant's affirmative defense necessarily renders all other facts immaterial.") (quotations and alterations omitted); *e.g., Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, No. 91-CV-1066, 1993 WL 489679, at *9 (N.D.N.Y. Nov. 18, 1993) ("[T]he court concludes that defendants have failed to establish the elements of their defense of impossibility.  Accordingly, the court holds that this affirmative defense creates no genuine issue of material fact and, therefore, does not preclude a grant of summary judgment in [Plaintiff's] favor."), *rev'd on other grounds*, 31 F.3d 113 (2d Cir. 1994).

New York law prohibits both civil and criminal usury.  *Adar Bays II*, 341 F. Supp. 3d at 352 ("New York law contains two usury provisions, one civil and one criminal.  The civil usury statute prohibits loans at rates exceeding 16% per annum.  N.Y. Gen. Ob. Law § 5-501.  Contracts proscribed by the civil usury statute are void.  [*Id.* § 5-511.]").  "Under New York law, a contract is criminally usurious . . . when the parties knowingly provided for an interest rate of 25% or more."  *Union Capital*, 2017 WL 1406278, at *4; *see* N.Y. Penal Law § 190.40 ("A person is guilty of criminal usury in the second degree when, not being authorized or permitted by law to do so, he knowingly charges, takes or receives any money or other property as interest on the loan or forbearance of any

money or other property, at a rate exceeding twenty-five per centum per annum[.]").[14] "'Usury is an affirmative defense and a heavy burden rests upon the party seeking to impeach a transaction for usury.'" *Union Capital*, 2017 WL 1406278, at *4 (quoting *Gandy Mach. Inc. v. Pogue,* 106 A.D.2d 684, 685 (N.Y. App. Div., 3d Dep't 1984)). "When a note is not usurious on its face, a court will not presume usury; rather, the party asserting the defense must prove all the elements," including "the lender's usurious intent." *Id.* (quotations omitted). "Such intent remains a question of fact and will not be presumed where a note states a legal rate of interest." *Id.* (quotations and alterations omitted).[15] "There is a strong presumption against the finding of usurious intent and a loan is not usurious merely because there is a possibility that the lender will receive more than the legal rate of interest." *Adar Bays II*, 341 F. Supp. 3d at 353 (quotations omitted).

"[T]here is no specific statutory authority for voiding a loan that violates the criminal usury statute." *Id.* at 352. "It is an open question under New York law whether a criminally usurious loan is void *ab initio* or whether a successful defense based on

---

[14] While PSID is asserting a criminal, rather than civil, usury defense, it frequently cites to sections of New York General Obligations Law title 5, *i.e.* the civil usury statute, in support of its arguments. (*See* Def.'s Resp. at 14-15). But a corporation cannot assert a civil usury defense. N.Y. Gen. Oblig. § 5-521; *LG Capital Funding, LLC v. 5Barz Int'l, Inc.* ("*5Barz*"), 307 F. Supp. 3d 84, 98 (E.D.N.Y. 2018) ("As a corporation, . . . defendant is statutorily barred from asserting a civil usury defense."). Moreover, PSID cites to the General Obligations law title 5 as "N.Y. Penal Law § 5" at least four times in its briefs. (*See* Def.'s Resp. at 14-15). Not only is this incorrect, because civil statutes are not penal laws, it is misleading; PSID blends their civil and criminal usury analyses to convince the Court the loan should be void *ab initio*. Because the Court finds the Note is not criminally usurious, it need not resolve PSID's problematic conflation of New York's civil and penal usury statutes.

[15] "The 'knowledge' requirement is satisfied with proof of a general intent to charge more than the legal rate of interest, as opposed to a specific intent to violate the criminal usury statute." *EMA Fin.*, 2019 WL 689237, at *6.

criminal usury results merely in the cancellation of the interest obligation or in a revised obligation to pay a non-usurious rate." *Adar Bays I*, 2018 WL 3962831, at *4; *accord Adar Bays, LLC v. Aim Expl., Inc.*, 285 F. Supp. 3d 698, 704 (S.D.N.Y. 2018) (citing *In re Venture Mortg. Fund, L.P.*, 282 F.3d 185, 189 (2d Cir. 2002)).

The Note's interest rate, on its face, is 10%. (Pl.'s Rule 56.1 Stmt. ¶ 16; Def.'s Resp. Rule 56.1 Stmt. ¶ 16; Note at 1). PSID argues that several factors, or combinations thereof, push the interest rate over 25% and make the Note criminally usurious: (1) the $3,000 payment of attorney's fees and the $3,150 origination fee; (2) the prepayment penalties of 120% and 135%; (3) the default interest rate of 24%; (4) the 35% conversion discount; and (5) the share reserve requirement. The Court addresses each argument in turn. None have merit.[16]

### 1. Attorney's Fees Payment and Origination Fee

PSID argues that, although the face value of the Note is $66,150, this figure is misleading because it only received $60,000: $3,000 was paid by LG to its own attorneys and $3,150 constituted a loan origination fee. (Def.'s Resp. at 3-4, 6). LG

---

[16] Several courts have found that a usury defense cannot apply once a loan's principal is converted to equity. *See Adar Bays II*, 2018 WL 3962831, at *5 ("[A]lthough the initial transaction, the Note, took the form of a loan, upon conversion to equity through exercise of the conversion right, the loan would likely have the character of an equity investment, at which point it would no longer be subject to a usury defense.") (quotations and alterations omitted); *Union Capital*, 2017 WL 1406278, at *5 ("[E]ven if the discount rate could be considered[,] a usury defense could no longer be applied against the loan once the Note principal was converted into equity in Vape."). This is true even if the conversion request is not honored. *5Barz*, 307 F. Supp. 3d at 99 ("Notably, the converted portion of the debt takes on the character of an equity investment even where a notice of conversion is properly submitted but is not honored."). Under such a theory, the portion of the Note LG attempted to convert on January 24, 2017 would no longer be considered a loan, and thus would no longer be subject to a usury defense. This Court need not reach the question of whether such an argument would prevail, because the Court finds that the usury defense fails on its own terms.

does not dispute that it wired $3,000 to New Venture Attorneys or only $60,000 to PSID. (Pl.'s Rule 56.1 Stmt. ¶¶ 24-25; Def.'s Resp. Rule 56.1 Stmt. ¶¶ 24-25). Essentially, PSID argues that, because it did not receive the entire $66,150 face value of the Note, the $6,150 in attorney's and origination fees should not count as principal; in other words, the interest rate should be calculated based on a loan of $60,000. (Def.'s Resp. at 3). In addition, PSID also argues that LG has not shown these fees are actual expenses of the loan; thus, they are "disguised interest" that should count among the many factors it believes push the interest rate above 25%. (*Id.* at 4, 6). These arguments have no merit.

First, PSID provides no authority to support the proposition that, because it only actually received $60,000, the principal value of the Note should only be considered a $60,000 obligation. It is common for a loan to be structured this way: if a person, for example, needs a net amount of $100,000 from a loan, she must take out a loan with a principal higher than $100,000 to account for costs and fees. No case cited by PSID allows a court to recalculate the principal amount of a loan should it find that the origination or attorney's fees were not actually incurred by the lender.

Second, PSID's argument that the origination fees and attorney's fees should be considered disguised interest also fails. "Under New York law, a borrower may pay all reasonable expenses incurred by the lender in making the loan without rendering the loan usurious." *Durante Bros. & Sons v. Flushing Nat'l Bank*, 652 F. Supp. 101, 105 (E.D.N.Y. 1986). Such expenses can include attorney's fees of the lender. *See id.* "[W]hen fee payments do not actually reimburse lenders for expenses associated with the loan[,] such fee expenses can be considered in determining the interest rate." *Union*

*Capital*, 2017 WL 1406278, at *4 (quotations and alterations omitted).  However, as stated above, a "heavy burden" rests on the party seeking to invoke a usury defense.  *Id.*

PSID has not met this burden.  PSID argues "the evidence shows that the Note and related deal documents used in this case are form documents that [New Venture Attorneys] and LG have used many, many times before" and that "PSID had even paid New Venture Attorneys to create this document multiple times before this particular time, as there were a number of other Notes between the parties before this one." (Def.'s Resp. at 4).  PSID does not cite to any such evidence or examples.  But even if the Court were to take these statements as true, PSID has done nothing to show the expenses were not legitimately incurred by LG or its attorneys.  PSID's explanation is speculative, conclusory, and not sufficient to put in dispute the issue of whether the $3,000 attorney's fees and $3,150 origination fee were actual expenses of the loan.  *See Adar Bays II*, 341 F. Supp. 3d at 347 ("The party opposing summary judgment 'may not rely on mere speculation or conjecture' as 'mere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'") (quoting *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010)); *e.g., Lloyd Capital Corp. v. Pat Henchar, Inc.*, 80 N.Y.2d 124, 127 (1992) ("[D]efendants suggest that the loan may be usurious because various closing costs must be considered interest as a matter of law.  However, a borrower may pay reasonable expenses attendant on a loan without rendering the loan usurious, and defendants made no showing that fees charged in this case were a pretext for higher interest, so as to create a

triable issue of fact.") (citation omitted).[17]  The Court thus does not consider these fees in determining whether interest rate on the Note is criminally usurious.

      2.  <u>Prepayment Penalties</u>

PSID next argues that the prepayment penalties of 120%, which apply if the Note was prepaid within 90 days of issuance, and 135% if the Note was prepaid within 91 to 180 days of issuance, should be considered interest and is clearly over the 25% usury rate.  (Def.'s Resp. at 1, 7; Def.'s Mem. at 5).

PSID gives no explanation, nor cites any authority, for the proposition that a prepayment penalty is interest.  The Courts that have examined prepayment penalties have concluded they are not considered interest and thus are irrelevant to the usury analysis.  *See Coastal Inv. Partners, LLC v. DSG Glob., Inc.*, No. 17-CV-4427, 2018 WL 2744719, at *7 (S.D.N.Y. June 6, 2018) ("[I]t is not clear that prepayment penalties constitute interest for the purposes of the criminal usury law.  Defendant cites no case law in support of this proposition.  Rather, the sparse case law concerning voluntary

---

[17] The primary case cited by PSID, *Hillair Capital Investments, L.P. v. Integrated Freight Corp.*, does not assist PSID.  (*See* Def.'s Resp. at 4-5 (citing 963 F. Supp. 2d 336 (S.D.N.Y. 2013))).  In *Hillair,* the Court found it could not determine—on a motion to amend—whether the fees deducted from the face amount were actually fees incurred by the lender.  963 F. Supp. 2d at 339-40.  The Court was determining whether the fees can be considered hidden interest, and not opining about how to calculate principal.  *Id. Hillair*, therefore, does not assist Defendant in reducing the principal amount of the obligation of the Note.  And *Hillair*'s conclusion about interest, made in the context of the facts of the loan in that case, does not create a *per se* rule that all origination fees should be considered interest.

PSID's citation to *Custom Chrome, Inc. v. Commissioner* is likewise inapposite.  (*See* Def.'s Mem. at 6 (citing 217 F.3d 1117 (9th Cir. 2000))); *cf. Blue Citi, LLC v. 5Barz Int'l Inc.*, 338 F. Supp. 3d 326, 335 (S.D.N.Y. 2018) ("Defendant relies on . . . *Custom Chrome Inc. v. Comm'r of Internal Revenue*, which stated, in dicta, that stock warrants provided in connection with a loan raised the loan's effective interest rate.  The Ninth Circuit made that statement in the context of the federal tax laws; the case therefore sheds no light on the definition of interest under New York's usury laws.") (quotations and citations omitted).

prepayment and corresponding penalties suggests that any prepayment charges do not constitute interest."); *Feldman v. Kings Highway Sav. Bank*, 278 A.D. 589, 589-90 (N.Y. App. Div., 2d Dep't) ("The [prepayment] was not in consideration of the making of a loan or of forbearance of money. It was the converse, that is, for the making of a new and separate agreement, the termination of the indebtedness. Accordingly, it was not a payment of interest and therefore could not be the basis of a claim of usury."), *aff'd*, 102 N.E.2d 835 (N.Y. 1951). And elsewhere PSID makes the assertion that "a loan is usurious when the lender is entitled to the principal balance along with a legal rate of interest plus additional payment *contingent on an event that is out of borrower's control*." (Def.'s Mem. at 8 (emphasis added)). Under PSID's own formulation, the prepayment penalty is not considered interest, because whether PSID chooses to prepay the loan is an event completely within its control. *See Coastal Inv. Partners*, 2018 WL 2744719, at *7 ("[P]repayment is a contingency within Defendant's control.") (citing *KBM World Wide, Inc. v. Hangover Joe's Holding Corp.*, No. 15-CV-7254, 2017 WL 685606, at *4 (E.D.N.Y. Feb. 1, 2017), *report and recommendation adopted*, 2017 WL 680418 (Feb. 21, 2017); *Salamone v. Russo*, 129 A.D.3d 879, 881 (N.Y. App. Div., 2d Dep't 2015)).

3. Default Interest Rate

PSID argues the 24% default interest rate, when combined with any other allegedly "disguised interest," makes the Note usurious. (*See* Def.'s Resp. at 1-2, 7; Def.'s Mem. at 5; Def.'s Reply Mem. of Law in Supp. of Def.'s Mot. filed Sept. 7, 2018, Dkt. No. 43 ("Def.'s Reply") at 6). In this Court's view, the default interest rate does not constitute interest.

"[T]he state of the law regarding whether New York's criminal usury cap applies to defaulted obligations is not entirely settled." *Aim Expl., Inc.*, 285 F. Supp. 3d at 705. "[W]hile two district courts have recently determined that the usury laws do, in fact, apply to default interest rates," *EMA Fin.*, 2019 WL 689237, at *10 (citing *Union Capital*, 2017 WL 1406278, at *8; *Madden v. Midland Funding, LLC*, 237 F. Supp. 3d 130, 143 (S.D.N.Y. 2017)),[18] "subsequent courts have expressly disagreed and instead have returned to the 'overwhelming authority to the contrary.'" *Id.* (quoting *LG Capital Funding, LLC v. One World Holding, Inc.*, No. 15-CV-698, 2018 WL 3135848, at *12 (E.D.N.Y. June 27, 2018)). "The bulk of authority supports [the] contention that default payments are separate and distinct from the actual interest rate and therefore are not relevant in determining if the rate is usurious." *Adar Bays II*, 341 F. Supp. 3d at 356 (quotations omitted); *see also Blue Citi, LLC v. 5Barz Int'l Inc.*, 338 F. Supp. 3d 326, 336 (S.D.N.Y. 2018) ("While the Second Circuit has not squarely ruled on the issue, the majority of district courts in this Circuit to have considered the issue have held that New York's usury laws do not apply to default interest rates.") (collecting cases). The Second Circuit has expressed, in a case dealing with civil usury, that New York's usury laws "do not apply to defaulted obligations." *Manfra, Tordella & Brookes, Inc. v. Bunge*, 794 F.2d 61, 63 n.3 (2d Cir. 1986). This Court agrees with the majority view that default interest rates should not be considered in an analysis of criminal usury.

The cases to the contrary do not persuade this Court to consider the default interest rate in determining whether criminal usury exists here.

---

[18] At least one other case in this Circuit, *LG Capital Funding, LLC v. Vapor Group, Inc.*, No. 16-CV-3951, 2018 WL 3193209 (E.D.N.Y. June 28, 2018), has held that the criminal usury cap applies to default interest rates. *See id.* at *3.

First, *Madden v. Midland Funding, LLC*, the primary case finding to the contrary, itself hedges and recognizes that the Second Circuit's statement that "usury laws do not apply to defaulted obligations" could broadly be referring to civil and criminal usury laws. 237 F. Supp. 3d at 141 ("Because the interest rate on the note was above the civil usury cap but below the criminal usury cap, the *Manfra* footnote—which is *dictum* in any event—cannot definitively be said to have ruled out application of the criminal usury cap to defaulted obligations. But its language does not distinguish between the two caps, lending some support to Defendants' position [that *Manfra* was referring to both civil and criminal usury laws.]"). Second, *Madden* also recognizes the law is unsettled in New York. *See id.* at 146 ("[S]everal [New York] decisions can be read to suggest that the criminal usury cap does not apply to defaulted obligations[.]"); *id.* ("[T]he issue may ultimately have to be settled by the New York Court of Appeals[.]"); *Blue Citi*, 338 F. Supp. 3d at 336 ("[E]ven [*Madden*] acknowledge[s] that, given the uncertainty surrounding this issue, a court could reasonably decide the issue either way.").

And the New York cases relied on in *Madden* that found the criminal usury cap applies to default interest suggest *Madden's* reliance on them was erroneous. *See Blue Citi*, 338 F. Supp. 3d at 336 ("[T]his Court is not persuaded by the authority cited in *Madden*. For example, *Madden* relies on several state cases holding that, where a contract allows for the collection of default interest at the 'highest rate permitted under law,' New York's criminal usury laws impose a cap of 25 percent. These cases, however, did not squarely decide whether the criminal usury laws apply to default interest; they merely used the 25 percent criminal usury cap as a reference point to define the contractual term 'highest rate permitted under law' because, without that reference

point, the term would have no meaning.") (citations omitted); *One World Holding*, 2018 WL 3135848, at *12-13 (distinguishing the cases cited in *Madden* and declining to follow its holding).[19]

Finally, *Madden* does not explain *why* default interest should be considered in a criminal usury analysis but not in a civil usury analysis (as *Manfra* held), nor does any other case of which this Court is aware. As explained above, criminal and civil usury differ in four principal ways: (1) one statute has criminal implications, the other does not; (2) criminal usury's threshold is 25%, the civil threshold is 16%; (3) a contract in violation of civil usury law is void *ab initio*; and (4) a corporation cannot invoke civil usury as a defense. None of these differences hinge on or derive from how interest is calculated. In other words, with New York courts—and the Second Circuit—having concluded that default interest rate is not used for the purpose of determining civil usury, they are likely to conclude that such interest should not count for determining criminal usury. It would be an odd result indeed if a loan to an individual had a default interest rate that would *not* subject the lender to a civil usury defense, but could simultaneously subject the lender to *criminal* liability.

In any event, this Court declines to follow *Madden* and does not consider the 24% default interest rate in its criminal usury analysis. *See, e.g.*, *EMA Fin.*, 2019 WL 689237, at *10 ("Thus, in line with the majority of courts in this Circuit, the Court holds that Defendants cannot maintain a usury defense based on the Note's default interest rate."); *Blue Citi*, 338 F. Supp. 3d at 337 ("In short, while it is possible the New York

_____

[19] This Court agrees with the reasoning in *Blue Citi, LLC v. 5Barz International Inc.* and *LG Capital Funding, LLC v. One World Holding, Inc.* and need not repeat it here.

Court of Appeals will see the issue differently, this Court finds that the policy judgments underlying the usury laws do not apply to agreed-upon default interest rates. Rather, this Court concurs with the majority view in this Circuit that default interest provisions do not render a note usurious.").

### 4. Conversion Discount

PSID next argues the 35% discount that LG receives when it exercises a conversion under the Note should be considered interest in a usury analysis. (*See* Def.'s Resp. at 7 ("[The conversion provision] means that, for every 65 cents of principal and interest owed, PSID must give LG a dollar's worth of freely-trading shares[.] With the 35% discount factored in, the borrower is paying an annual interest rate over 100%."); Def.'s Mem. at 8 ("The 35% discount is reserved interest that has a separate value that is legally required to be included in the usury analysis.")).[20]

PSID is incorrect. There is no guarantee that LG will ever use the conversion feature. *Adar Bays I*, 2018 WL 3962831, at *5 ("[P]laintiff merely possessed an option to convert principal and interest into equity, and could instead have elected to obtain repayment in cash, which would clearly not have been usurious."); *Union Capital*, 2017 WL 1406278, at *5 ("Union simply held an option to convert shares, and it could have elected to obtain repayment in cash, which would clearly not have been usurious."). It is not just that the lender may prefer cash over conversion. The decision on whether to

---

[20] At one point, PSID argues that LG has essentially admitted the interest rate is 284%. (Def.'s Mem. at 5). LG does admit that had PSID honored its January 24, 2017 conversion request on $17,039.36 ($16,150 in principal and $889.36 in interest), it could have made a return of $65,536 from reselling the stock, which is about 3.84 times the conversion price. (*Id.*; Def.'s Resp. Rule 56.1 Stmt. ¶ 129; Pl.'s Reply Rule 56.1 Stmt. ¶ 129; *see* Lerman Decl. ¶ 45). LG, however, has in no way admitted that such gains are considered interest and no authority or logic supports such an inference.

convert and whether conversion is even possible is dependent upon a number of other factors, including the stock price and whether the issuer is able to satisfy the conversion request. *See Adar Bays II*, 341 F. Supp. 3d at 356 ("As courts have noted, a myriad of circumstances could decrease the price of the stock, including that Defendant could become delinquent in its filings, become delisted, experience sudden decreases in its stock price, experience no demand for its stock, or simply cancel the reserve or refuse a conversion.") (quotations omitted).[21] Much like the prepayment penalty, conversion is a speculative occurrence.[22]

This element of speculation distinguishes the conversion value from interest:

> Interest is, by definition, a payment made with a degree of certainty and regularity; conversion options, by contrast, lack certainty, *because they may or may not be exercised* and because their value fluctuates depending on the prevailing market price of the shares. Thus a conversion price is not an interest payment and, accordingly, does not fall under the protection of the usury laws.

*Blue Citi*, 338 F. Supp. 3d at 335 (emphasis added) (citations omitted).[23]

---

[21] In fact, here, PSID refused to honor LG's January 24, 2017 conversion request. (Pl.'s Rule 56.1 Stmt. ¶¶ 62-63; Def.'s Resp. Rule 56.1 Stmt. ¶¶ 62-63).

[22] PSID cites *Phlo v. Stevens* as finding a conversion discount constitutes interest. (Def.'s Mem. at 8 (citing No. 00-CV-3619, 2001 WL 1313387, at *4 (S.D.N.Y. Oct. 25, 2001), *aff'd*, 62 F. App'x 377 (2d Cir. 2003))). Nothing in *Phlo* can be read to stand for such a proposition, and the court in that case unequivocally rejected the criminal usury defense. 2001 WL 1313387, at *4-5; *see EMA Fin.*, 2019 WL 689237, at *8 ("Defendants cite *Phlo Corporation v. Stevens* as holding that a contingent right of stock options is something of value to be considered in a usury analysis. But *Phlo* says no such thing.") (quotations and citations omitted) (alterations omitted). In fact, elsewhere in its briefs, PSID goes to great lengths to distinguish *Phlo* from this case. (*See* Def.'s Resp. at 9-10).

[23] The Court, therefore, need not decide that, once converted, the shares are more akin to equity rather than a loan and thus the usury laws do not apply. *See Blue Citi*, 338 F. Supp. 3d at 335 ("New York's usury laws do not apply to an option to convert a loan's principal into shares of stock. This is because the usury laws apply only to loans, not investments. Once a loan's principal is converted to shares, the transaction takes on

The Court, therefore, agrees with the overwhelming authority that the 35%

conversion discount does not constitute interest. *See EMA Fin.*, 2019 WL 689237, at *8

("[T]he case law in this District is uniform in holding that the value of conversion

discounts should not factor into the usury analysis.").

### 5. Share Reserve Requirement

Finally, PSID argues the share reserve requirement of the Note, which required

PSID to initially reserve 2,467,000 shares and at all times reserve at least four times the

number of shares required for the Note to be converted in full, renders the Note

usurious under New York General Obligations Law §§ 5-511 and 5-501.[24]  (Def.'s Mem.

at 7).  PSID also argues the reservation requirement is, in effect, an opportunity cost

because it prevented PSID from selling the stock to a third party.  (*Id.*).  Both arguments

are meritless.

First, §§ 5-511 and 5-501 pertain to the affirmative defense of *civil* usury, which a

corporation cannot assert.  *See Coastal Inv. Partners*, 2018 WL 2744719, at *5

("Defendant also argues that the Notes are criminally usurious because they require

Defendant to reserve shares as security for the loans to set aside for the conversion

option. . . .  This argument fails though because, on its face, § 5-511 applies to civil, not

criminal usury.  Corporations, including Defendant in this action, cannot assert a civil

---

the character of an equity investment, and the usury laws no longer apply.") (quotations
and citations omitted).

[24] Section 5-511 provides that "[a]ll . . . notes . . . whereupon or whereby there
shall be reserved or taken, or secured or agreed to be reserved or taken, any greater sum,
or greater value, for the loan or forbearance of any money, goods or other things in
action, than is prescribed in section 5-501, shall be void."  N.Y. Gen. Oblig. Law § 5-511.
Section 5-501 prohibits, by reference to the banking law, loans with an interest rate of
greater than 16%.  N.Y. Gen. Oblig. Law § 5-501; *see* N.Y. Banking Law § 14-a(1).

usury defense."); *Aim Expl., Inc.*, 285 F. Supp. 3d at 703-04 ("Aim Exploration also argues that the Note is criminally usurious because it reserved 1,168,000 shares of stock at the time the loan was made. As support, Aim Exploration cites New York General Obligations Law § 5-511[.] . . . On its face, § 5-511 is a statute applicable to the defense of civil usury, not criminal usury as alleged here. The civil defense of usury cannot be asserted by a corporation[.]") (citation omitted).

Second, "the reservation of shares [is] not an independent payment," "but merely a mechanism by which to effectuate the share conversion as envisioned by the Note[.] [And] [s]ince the share conversion feature does not render the agreement usurious, neither does the reservation of shares provision." *Aim Expl.*, 285 F. Supp. 3d at 704; *accord Adar Bays I*, 2018 WL 3962831, at *6; *see also Blue Citi*, 338 F. Supp. 3d at 336 ("Defendant argues that the share reserve required by the Note constitutes usurious interest. . . . The Note did not require the share reserve to be paid to Plaintiff; it was simply security that Defendant was required to set aside so that there would be shares available if Plaintiff exercised its conversion option. Defendant cites no authority for counting such security as interest under the usury laws."). That it imposes an opportunity cost may be a reason not to borrow the funds and enter into the transaction, but requiring share reservation has nothing to do with interest payments and therefore is inapposite to a criminal usury analysis.

*          *          *

With the exception of attorney's fees and origination fee, none of the above factors should be considered in a criminal usury analysis, and PSID has not demonstrated an issue of fact pertaining to the purposes of the attorney's fees or origination fee. As a matter of law, the Note, therefore, is not usurious. The Court,

therefore, need not decide the issue of whether a criminally usurious loan is void *ab initio* under New York Law. *See, e.g.*, *Adar Bays II*, 341 F. Supp. 3d at 357 ("Since the Court determines that the Note is not usurious, it need not determine the appropriate remedy here.").

C.    Unconscionability

PSID also argues, in passing, that the Note is unenforceable because it is an unconscionable contract. (Def.'s Resp. at 16-17).

"Under New York law, a contract is unconscionable when it is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be [unenforceable] according to its literal terms." *Agerbrink v. Model Serv. LLC*, 293 F. Supp. 3d 470, 481 (S.D.N.Y. 2018) (quotations omitted). "A determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made—i.e., some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party[.]" *Gillman v. Chase Manhattan Bank*, 73 N.Y.2d 1, 10 (1988).

"[U]nconscionability is an affirmative defense to the enforcement of a contract," *Colonial Funding Network, Inc. v. Epazz, Inc.*, 252 F. Supp. 3d 274, 285 (S.D.N.Y. 2017) (quotations omitted), and the party asserting the defense on summary judgment has the burden of raising a genuine issue of material fact. *See, e.g.*, *Tokio Marine v. Macready*, 803 F. Supp. 2d 193, 199 (E.D.N.Y. 2011) ("In any event, even assuming that the Macreadys did not waive the defense [of unconscionability], they have not raised a genuine issue of material fact that precludes summary judgment.").

PSID cites to no evidence that speaks to the issue of unconscionability, nor are any of its Rule 56.1 statements identified as pertinent to the defense. PSID also does not even put forth the elements of an unconscionability defense in its briefs; it simply argues a loan can be unconscionable even if it is not criminally usurious. (Def.'s Resp. at 16). While this may be true, PSID has done nothing to apply the facts of this case to the defense, and it is not the Court's job to do so on its behalf. As a result, this unsupported assertion of unconscionability is insufficient to preclude a grant of summary judgment against PSID on the breach of contract claims. *See, e.g.*, *Clarke v. Max Advisors, LLC*, 235 F. Supp. 2d 130, 145 (N.D.N.Y. 2002) ("While plaintiffs have argued in support of their unconscionability defense that no reasonable person would have entered into the agreement struck by the parties, there are no specifics alleged as to how any of the provisions contained within the relevant agreements were not commercially reasonable. In light of the lack of any evidence suggesting that a reasonable jury could make a finding of substantive unconscionability, I reject the unconscionability defense now proffered by the plaintiffs . . . as a basis for denial of defendants' motion for summary judgment on the note claims."); *Tulger Contracting Corp. v. Star Bldg. Sys., Inc.*, No. 01-CV-6853, 2002 WL 986994, at *2 (S.D.N.Y. May 14, 2002) ("Plaintiff . . . argues that the above-quoted limitations are unconscionable as a matter of public policy. But in response to defendant's summary judgment motion, plaintiff has failed to adduce competent evidence sufficient to make this a jury question.").

D.  <u>Remedies for Breach of Contract</u>

The Court recommends withholding a decision on damages or injunctive relief until the issue can be adequately briefed and the Court has held an inquest hearing. Both parties' submissions on these issues are insufficient.

First, each party calculates damages based on a different trade price of PSID stock on the date of the notice of conversion, January 24, 2017. LG uses a high trade price of $0.001 for that day to argue its expectation damages were $65,536 for failure to deliver the 65,536,000 shares of stock. (Pl.'s Mem. at 14). LG then extrapolates this ratio to argue it should receive $192,500 in anticipated lost profits on the remaining balance of the loan. (*Id.* at 15). PSID argues that at most LG would be entitled to the difference between the contract price of $0.00026 and the fair market value at the time of breach, which according to PSID was $0.0005 per share. (Def.'s Mem. at 4). At the same time, in its own Rule 56.1 Statement, PSID recognizes that LG could have made $65,536 based on a $0.001 price per share had it honored the notice of conversion. (*See* Def.'s Resp. Rule 56.1 Stmt. ¶ 129).

Neither party explains why the value they chose, either $0.001 or $0.0005, should be used in the calculation of damages. Both sets of motion papers are devoid of authority, aside from citing a single case each, supporting their method of damages calculations. In addition, each party submitted differing stock charts, (*see* Stock Sheet, attached as Ex. H to Lerman Decl., Dkt. No. 31 ("LG Stock Sheet"); Stock Sheet, attached as Ex. 1 to Caragol Decl., Dkt. No. 35 ("PSID Stock Sheet")), which neither side cites nor explains in its Rule 56.1 Statements. This makes it difficult for the Court to understand whether there are disputes as to the actual value of the stock, in addition to disputes about the values that should be used in the damage calculation. The Court, therefore, does not have enough information to calculate damages and requires additional submissions. *See EMA Fin.*, 2019 WL 689237, at *11 ("[W]hile summary judgment is granted to EMA on the question of Defendants' liability, the Court will withhold a finding as to the extent of EMA's damages pending supplemental briefing by the

parties."); *LG Capital Funding, LLC v. 5Barz Int'l, Inc.*, 307 F. Supp. 3d 84, 104 (E.D.N.Y. 2018) ("The court . . . lacks any information as to what the market price of defendant's shares was as of May 9, 2016, and thus cannot determine plaintiff's actual damages.").

LG's request for injunctive relief is equally problematic.  Although two of LG's breach of contract claims seek injunctive relief,[25] it does not mention injunctive relief in its moving papers and only does so in its response to PSID's motion.  (*See* Pl.'s Mem. in Opp'n, Dkt. No. 37 ("Pl.'s Resp.") at 3-5).  Even then, LG does not explain why injunctive relief is appropriate despite the fact that damages for failure to deliver shares are calculable, nor does it explain why it should get damages *and* injunctive relief entitling it to the issuance of 65,536,000 shares.  (*See id.*).  In addition, it is unclear why LG's request for injunctive relief requiring PSID to maintain adequate share reserves, (*see* Compl. ¶¶ 46), is not moot due to the Note's maturity.  The Court recommends that, following any ruling on this Report and Recommendation, LG be directed to clarify its position on injunctive relief.

E.    Attorney's Fees

"Under New York law, a contract that provides for an award of reasonable attorneys' fees to the prevailing party in an action to enforce the contract is enforceable if the contractual language is sufficiently clear."  *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 175 (2d Cir. 2008).  "'The fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours

---

[25] Claim 1 seeks an injunction ordering PSID to deliver the requested 65,536,000 shares of stock.  (Compl. ¶ 37).  Claim 3 seeks an injunction ordering PSID to maintain adequate share reserves.  (*Id.* ¶ 46).

expended and hourly rates.'" *Blue Citi*, 338 F. Supp. 3d at 341 (quoting *Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1160 (2d Cir. 1994)). "[F]or the court to determine the reasonableness of plaintiff's fee request, the court must know the amount of fees requested. Plaintiff must also submit, at a minimum, information regarding counsel's professional experience, as well as contemporaneous billing records, which must indicate the hourly rate billed and include information as to the work undertaken by counsel and the time spent on each task." *5Barz*, 307 F. Supp. 3d at 104.

Here, the language of Note is sufficiently clear and "[c]ourts in this Circuit have enforced nearly identical fee-shifting provisions." *Adar Bays I*, 2018 WL 3962831, at *15. LG argues it is entitled to attorney's fees, costs, and expenses under sections 7 and 8 of the Note. (Pl.'s Mem. at 16-18; *see also* Compl. ¶¶ 65-66). Section 7 provides that PSID "agrees to pay all costs and expenses, including reasonable attorneys' fees and expenses, which may be incurred by [LG] in collecting any amount due under this Note," and Section 8 provides that, should LG prevail in an action to enforce the provisions of the Note, LG "shall be reimbursed by [PSID] for its attorneys' fees and other costs and expenses incurred in the investigation, preparation and prosecution of such action or proceeding." (Note ¶¶ 7-8).

PSID does not argue otherwise. LG is, therefore, entitled to reasonable attorney's fees and costs for its breach of contract claims. *See, e.g.*, *EMA Fin.*, 2019 WL 689237, at *13 ("Defendants do not dispute that AIM-Inc. agreed to pay all costs and expenses incurred by EMA in collecting amounts owed under the Note[.] Consequently, summary judgment in favor of EMA as to Defendants' liability for attorneys' fees and expenses incurred in bringing this action is granted[.]") (citation omitted); *5Barz*, 307 F. Supp. 3d at 99-100 ("Defendant has failed to comply with the terms of the Note, plaintiff

has commenced an action to enforce the Note's provisions, and, because the court has granted summary judgment as to plaintiff's second claim for relief, plaintiff has prevailed in that action. Plaintiff is therefore entitled to, and the court grants, summary judgment as to defendant's liability for reasonable attorneys' fees and expenses.").

However, LG has failed to submit any of the required information for the Court to determine the amount of attorney's fees; it does not even make a request for a specific amount, let alone submit contemporaneous time records. LG also failed to submit any documentation of costs. The Court thus cannot award fees or costs at this time. *5Barz*, 307 F. Supp. 3d at 104 ("None of the necessary information to determine a reasonable attorneys' fee is before the court. Although the court has granted summary judgment as to liability for attorneys' fees, the balance of plaintiff's motion for summary judgment as to attorneys' fees is denied for lack of record evidence to support a specific award of fees. This denial is without prejudice to plaintiff's ability to renew its motion for an award of attorneys' fees in a specific amount upon submission of proper documentation[.]"). The Court recommends that LG be directed to submit the required information (namely, contemporaneous billing records and expense invoices), along with its supplemental briefings on damages and injunctive relief, after any ruling on objections to this Report and Recommendation. *See Adar Bays I*, 2018 WL 3962831, at *15 (directing supplemental briefing on attorney's fees).

II.     PSID's Motion for Summary Judgment

PSID has moved for summary judgment on all of LG's claims.[26]  In light of the

Court's recommendation to grant LG's motion for summary judgment as to liability on

the failure to reserve (Claim 3), failure to deliver (Claims 1 and 2), and attorney's fees

(Claim 8) claims, and in light of the Court's recommendation to direct further briefing

on damages and injunctive relief, PSID's motion for summary judgment on these claims

should be denied.  LG has not moved for summary judgment on Claims 4 and 5 for

anticipatory breach of contract or Claims 5 and 6 for conversion, (*see* Pl.'s Mem. at 1);

the only issues that remain, therefore, are whether these claims should be dismissed as a

matter of law.

A.      Anticipatory Breach of Contract

LG's anticipatory breach of contract claims assert that PSID's failure to honor the

January 24, 2017 conversion request indicates it would refuse to honor future

conversion requests by LG.  (*See* Compl. ¶¶ 49-51).

"Under New York Law, a party to a contract commits an anticipatory breach of

the contract when prior to the time set for performance under the contract, it declares

expressly or by its conduct that it will not perform its part of the bargain." *In re Brown*

*Pub. Co.*, 486 B.R. 46, 54 (Bankr. E.D.N.Y. 2013) (quotations omitted); *see also In re*

*Asia Glob. Crossing, Ltd.*, 326 B.R. 240, 249 (Bankr. S.D.N.Y. 2005) ("An anticipatory

repudiation occurs when a party to a contract (1) states that he cannot or will not

perform his obligations, or (2) commits a voluntary affirmative act that renders the

_____

[26] Although PSID's motion is titled as one for partial summary judgment, and
PSID itself believes there are issues of fact concerning the breach of contract claims, (*see*
Def.'s Mem. at 8, 10), it clearly seeks resolution in its favor on all claims, (*see id.* at 1-4).

obligor unable or apparently unable to perform his obligations."), *adhered to in part on reargument*, 332 B.R. 520.[27] "[W]hen a party repudiates contractual duties prior to the time designated for performance and before all of the consideration has been fulfilled, the repudiation entitles the nonrepudiating party to claim damages for total breach." *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 704 N.E.2d 656, 659, (N.Y. 1998) (quotations omitted). "For a statement to constitute an anticipatory breach, the announcement of an intention not to perform [must be] positive and unequivocal." *Asia Glob. Crossing*, 326 B.R. at 249 (quotations omitted).

PSID argues that there is no evidence to support the claims for anticipatory breach of contract. LG, however, does identify an email sent from PSID to LG with an attached forbearance agreement asking it not to submit any future conversions. (Pl.'s Resp. at 7; *see* Pl.'s Resp. Rule 56.1 Stmt. ¶ 6[28]). The proposed agreement did not contain an offer of consideration in exchange for the forbearance, and thus, according to PSID's Chief Executive Officer, "smacks . . . of sarcasm." (Pl.'s Resp. Rule 56.1 Stmt. ¶¶ 7-8[29] (citing Caragol Dep. at 81:6-21)). LG argues, therefore, this email from PSID should be read as an anticipatory repudiation of the Note. (Pl.'s Resp. at 7). PSID does

---

[27] It is possible that repudiation of a contract would not create a cause of action for anticipatory breach of contract, should the non-repudiating party continue to treat the contract as valid. *See* 28 Glen Banks, New York Contract Law § 14:14 (2018) ("A party that elects to treat the repudiated contract as valid and does not take action in response to an anticipatory breach, may not assert a claim against the repudiating party until an actual breach occurs."). PSID does not make such an argument.

[28] This citation refers to ¶ 6 in "Plaintiff's Counter-Statement" filed in response to PSID's motion.

[29] This citation refers to ¶¶ 7-8 in "Plaintiff's Counter-Statement" filed in response to PSID's motion.

not dispute the underlying facts; it did not submit a Rule 56.1 Statement in response to LG's Counter-Statement of Facts, nor does it dispute in its briefs that the email could constitute an anticipatory breach. As a result, it is inappropriate to grant PSID summary judgment on this claim. *See In re Residential Capital, LLC*, 533 B.R. 379, 405 (Bankr. S.D.N.Y. 2015) ("Where a genuine issue of fact exists as to whether a party committed an anticipatory breach of contract, summary judgment is unwarranted.") (citing *About.com, Inc. v. TargetFirst, Inc.*, No. 01-CV-1665, 2003 WL 942134, at *4-5 (S.D.N.Y. Mar. 10, 2003)); *id.* ("An anticipatory breach may occur where the other party has attempted to avoid its obligations by advancing an 'untenable' interpretation of the contract, or has communicated its intent to perform only upon the satisfaction of extracontractual conditions.") (quotations and alterations omitted).[30]

However, LG should be directed to indicate how it wishes to proceed on its anticipatory breach claim, including how and whether the liability for and remedies resulting from this claim overlap with the claims for breach of contract, which the Court has already recommended be resolved in LG's favor. *See 5Barz*, 307 F. Supp. 3d at 93-94.

B.    Conversion

Under New York law, "[c]onversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403-04 (2d Cir. 2006)

---

[30] PSID's passing statement that an anticipatory breach cannot occur for an executory contract for the payment of money is irrelevant. (*See* Def.'s Mem. at 2-3). The Note does not just involve the payment of money only. The cases cited by PSID involve failure to pay insurance installments, and PSID has failed to make any connection between those cases and this one. PSID has not explained why the Note is an executory contract.

(quotations omitted).  The elements of conversion are:  "(1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights."  *Alzheimer's Disease Res. Ctr., Inc. v. Alzheimer's Disease & Related Disorders Ass'n, Inc.*, 981 F. Supp. 2d 153, 163 (E.D.N.Y. 2013) (quotations omitted).  To make out a conversion claim for an interest in stock, a plaintiff must allege that it "was issued stock certificates that were taken by defendants" or that it had some other kind of possession of the shares.  *Jin Young Chung v. Yoko Sano*, No. 10-CV-2301, 2011 WL 1303292, at *17 (E.D.N.Y. Feb. 25, 2011), *report and recommendation adopted*, 2011 WL 1298891 (Mar. 31, 2011).

LG cannot meet the second element of a conversion claim because, as it concedes by asserting a failure to deliver claim, it never had possession of the shares.  LG argues that the involvement of the stock transfer agent who was instructed to reserve shares and issue them to LG upon a notice of conversion changes the analysis.  (Pl.'s Resp. at 6).  It does not.  It is irrelevant that the shares were in the possession of the transfer agent because it does not alter the underlying fact that LG never possessed, controlled, or owned the shares of stock.  Indeed, in *LG Capital Funding, LLC v. CardioGenics Holdings, Inc.*, this Court dismissed LG's conversion claims for failure to allege possession.  *See* No. 16-CV-1215, 2018 WL 1521861 (E.D.N.Y. Feb. 20, 2018), *report and recommendation adopted*, 2018 WL 2057141 (Mar. 8, 2018).  In LG's *CardioGenics* complaint, the defendant in that case instructed the transfer agent to reserve stock for issuance upon a notice of conversion, which is the same role the transfer agent is alleged

to have played in this case.  (*See* Compl. dated Mar. 10, 2016, No. 16-CV-1215, Dkt. No. 1 ("*CardioGenics* Compl.") ¶ 13; Compl. ¶¶ 5, 7).

LG cannot, as a matter of law, establish a claim for conversion.  *See CardioGenics*, 2018 WL 1521861, at *6 ("[T]he Complaint alleges that CGNH failed to deliver any shares and LG never received them.  CGNH could not have converted LG's shares if LG never received them or actually possessed them.  There was nothing for CGNH to convert."); *Jin Young Chung*, 2011 WL 1303292, at *17 (dismissing conversion claim where plaintiff failed to allege "defendants actually took possession of physical documents reflecting her ownership of the companies.").  Therefore, the Court recommends that PSID's motion for summary judgment on the conversion claims be granted.[31]

<h2 style="text-align:center">CONCLUSION</h2>

For the reasons described above, the Court respectfully recommends:

(1) LG's motion for summary judgment be granted as to liability on its breach of contract claims, Claims 1 through 3;

(2) LG's motion for summary judgment be granted as to liability on its attorney's fees claim, Claim 8;

---

[31] In any event, LG's conversion claim is duplicative of its failure to deliver claims. *See Union Capital*, 2017 WL 1406278, at *3 ("For a conversion claim to succeed in the context of a dispute regarding contract, the breach of contract must result in some 'wrong' that is separately actionable.  Here, Union's conversion claim exactly mirrors its breach of contract claim.  Union alleges no additional, separately actionable wrong that is independent of its breach of contract allegations. . . .  Since Union's conversion claim is merely seeking enforcement of the bargain set forth in the Contracts, it must be dismissed as duplicative.") (quotations and citations omitted); *accord 5Barz*, 307 F. Supp. 3d at 93-94.

(3) The parties be directed to brief the issues of damages and injunctive relief on Claims 1 through 3 and Claim 8;

(4) PSID's motion for summary judgment be granted on LG's conversion claims, Claims 6 and 7;

(5) PSID's motion for summary judgment be denied on LG's anticipatory breach claims, Claims 4 and 5; and

(6) LG be directed to brief whether the liability and remedies for its anticipatory breach claims overlap with the breach of contract claims, or whether LG intends to abandon these claims in light of the Court's award of summary judgment on its other claims.

Any objections to the Report and Recommendation above must be filed with the Clerk of the Court within 14 days of service of this report. Failure to file objections within the specified time waives the right to appeal any judgment or order entered by the District Court in reliance on this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); *Caidor v. Onondaga Cty.*, 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate[ ] [judge's] report operates as a waiver of any further judicial review of the magistrate[ ] [judge's] decision.").

SO ORDERED.

*/s/ Sanket J. Bulsara* July 29, 2019
SANKET J. BULSARA
United States Magistrate Judge

Brooklyn, New York